**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16 C 7601** |
| | ) | |
| **BOARD OF TRUSTEES FOR THE** | ) | |
| **ANCONA SCHOOL, et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

James Doe is the pseudonym of a student who, until fourth grade, attended the Ancona School, a private school in Hyde Park in Chicago. His father, John Doe, contends that James left the school when administrators imposed unfair requirements upon the Does because of their Muslim faith, in violation of 42 U.S.C. § 1981 and Illinois common law. The defendants have moved for summary judgment.

### Background

The Does contend that, because of their Muslim faith, they were subjected to unfair conditions on James's ability to reenroll at Ancona for the fifth grade. The defendants respond that these requirements were imposed with James's academic performance in mind, not his religion. Thus the Court begins by reviewing James's educational background.

From preschool through fourth grade, James attended Ancona. During second, third, and fourth grade, James's teachers expressed concern about his ability to focus

on tasks and his academic ability relative to his peers, as he performed at approximately one grade level below his fellow students. James underwent a psychological evaluation in April 2015 in which the psychologist found evidence that he had elevated symptoms of inattention consistent with ADHD.

As a private school, Ancona enters into contracts with its families for each year of a student's enrollment. In March 2016, the Does noticed that Ancona had not yet sent them a contract for James's fifth grade enrollment. After the Does inquired, Ari Frede, the principal, stated in a letter that Ancona would enroll James in fifth grade only if the Does met two conditions, described in the letter as "stipulations." D.E. 30, Defs.' Ex. B at 1 (Mar. 21, 2016 Ancona Letter to Does). First, the Does would have to employ an aide who would work one-on-one with James. Second, the Does would have to "bring back an informed, expert medical opinion about the risks and benefits of prescribing medication for [James'] diagnosis of ADD." *Id.* During his deposition, Frede stated that, in the past, other Ancona families had been required to provide a one-on-one aide as a condition of enrollment. The Does did not fulfill the conditions; James's spot at the school was released; and he ultimately attended a different school for fifth grade.

The plaintiffs contend that these conditions were actually imposed not due to James's academic performance but due to his alleged misbehavior. They further contend that the defendants' decision to impose the conditions was unfair, as other students who engaged in similar misconduct were not required to meet comparable conditions. In one incident, plaintiffs contend, a group of boys attacked James, holding him down and striking him. In another, a student told James—unheard by any teachers—that "the only reason Donald Trump says that all Muslims should be kicked

2

out of the country is because all Muslims work for ISIS."  In a third incident, a female student kicked James after he accidentally pressed her against the wall.  None of these students were required to satisfy conditions to reenroll.  The Does ask the Court to compare this misbehavior to James's misbehavior:  two students accused James of swearing at another student and using a racial slur toward that student.  The Does contend that the defendants unfairly singled James out for punishment based on his Muslim faith, as the other students, who were not Muslim, were not required to satisfy conditions in order to reenroll at the school.

In July 2016, the Does filed the present lawsuit, naming as defendants Frede, the Ancona School, and the school's Board of Trustees.  The Does allege that the defendants violated section 1981 by interfering in James's enrollment on the basis of race[1] and that the defendants are liable for intentional infliction of emotional distress.  Now that discovery has been completed, the defendants have moved for summary judgment.

## Discussion

On a motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court "draw[s] all reasonable inferences in favor of the party opposing summary judgment[.]" *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 814 (7th Cir. 2017).  "On summary judgment a court may not make credibility determinations, weigh the evidence, or

---

[1] What constitutes discrimination on the basis of race is construed broadly for purposes of a section 1981 claim.  *Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008).  The defendants do not dispute that section 1981 applies to the Does.

decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## I.  Section 1981

The Does first contend that the defendants violated 42 U.S.C. § 1981.  Making a contract, such as James Doe's reenrollment contract, is an activity protected under section 1981.  *Sanghvi v. St. Catherine's Hosp., Inc.*, 258 F.3d 570, 573 (7th Cir. 2001).  "To establish a claim under § 1981, the plaintiffs must show that (1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)."  *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996).

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit addressed the proliferation of evidentiary rules that grew around the traditional analysis of discrimination that the Supreme Court offered in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The Seventh Circuit stripped away many of the evidentiary rules surrounding the *McDonnell Douglas* framework, holding that "all evidence belongs in a single pile and must be evaluated as a whole."  *Ortiz*, 834 F.3d at 766.  The Court therefore analyzes the plaintiffs' contentions under the burden-shifting approach in *McDonnell Douglas* and using the approach adopted in *Ortiz*.  *See David v. Bd. of Trustees of Community Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("[B]oth before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases.").

4

### A.    *McDonnell Douglas*

To sustain a claim under the *McDonnell Douglas* framework, the plaintiffs must first establish a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802-05.  The burden then shifts to the defendants, who must articulate "some legitimate, nondiscriminatory reason" for the purportedly discriminatory conduct.  *Id.* at 802-03.  If the defendants can do so, the plaintiffs must show that the defendants' proffered reason is pretextual.  *Id.* at 804.  The law allows the Court to skip ahead to the pretext analysis in appropriate cases.  *See Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 556-57 (7th Cir. 2001) (a court may assume without deciding that the plaintiff met his prima facie case when the court finds that the defendant offered a non-pretextual reason for the contested action).  In this case, the defendants contend that the conditions cited by plaintiffs were imposed because of school administrators' concerns about James's academic progress, not his misbehavior.  In particular, the defendants contend they acted out of concern for his difficulties remaining focused during class and his low levels of academic achievement.  They contend that the conditions—a one-on-one aide and the possibility of treatment for ADD—were closely associated with these difficulties.

Because the defendants have adequately articulated a legitimate, nondiscriminatory reason for the conditions they imposed on James's reenrollment, the Court proceeds to assess whether a reasonable jury their articulated reasons to be pretextual, in other words, "a lie, specifically a phony reason for some action."  *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).  To show that the defendants' explanation is pretext, the Does present three arguments:  (1) other similarly-situated students did not need to fulfill conditions in order to reenroll; (2) Frede was widely

known to engage in discrimination at Ancona; and (3) Frede showed personal hostility to James.[2]

First, the Does contend that similarly-situated students (referred to as comparators) did not have conditions imposed for reenrollment. The Does must present evidence from which a reasonable jury could find that the proposed comparators are "directly comparable . . . in all material respects," which is determined by way of a "flexible, common-sense, and factual inquiry." *David*, 846 F.3d at 216.

No reasonable jury could find that the students the Does offer as comparators are similarly situated, as there is nothing in the record indicating that any of these students had a history of academic difficulties, unlike James. No reasonable jury could find defendants' reliance on James's academic difficulties was a smokescreen. In second grade, James's teacher noted that he had trouble focusing on tasks and required monitoring during independent work activities. In third grade, his teacher noted that James "remains a full academic year behind his peers." D.E. 30, Defs.' Ex. P at ANCONA0258 (James Progress Rep. 2014-15). His teacher also noted that "his difficulties seem to have attentional or emotional aspects[.]" *Id.* at ANCONA0261. In James's fourth grade report, his teacher also noted his attention issues, stating that he "needs frequent monitoring in order to begin and continue to make progress on routine tasks." *Id.*, Defs.' Ex. E at ANCONA0283 (James Progress Rep. 2015-16). James also underwent an examination by a psychologist in April 2015; the psychologist found evidence of hyperactivity and inattention.

---

[2] To the extent the plaintiffs argue that Frede's Jewish faith supports a finding that he discriminated against James for being Muslim, the Court rejects this line of argument and observes that it is a rather unbecoming argument for a member of the bar to make, to say the least.

The defendants also present evidence that James's academic difficulties played a critical role in their decision to impose conditions on his reenrollment. On March 1, 2016, the Does contacted Ancona to ask why James had not received a reenrollment contract for fifth grade; they learned the contract was held "due to a pending academic review." D.E. 30, Defs.' Ex. K at 31:19-21 (Doe Dep.). On March 8, the Does met with Ancona administrators to "review James' academic needs and concerns." *Id.* at 39:19-20. Then, on March 21, the Does received the letter imposing the requirements for James's reenrollment. The letter discusses the following: the discussion on March 8 regarding James's academic progress; his previous progress reports; the school's attempts to support him in class; and the ways in which an academic aide may "encourage his growth" and "ability to work independently." D.E. 30, Def.'s Ex. B at ANCONA0057-58. The letter contains *no* mention of James's behavioral issues vis-a-vis other students, and no suggestion that the aide might mitigate those concerns.

The Does did not meet the conditions that the school imposed. On July 5, 2016, the defendants sent the Does a second letter. In relevant part, the letter states: "In the spring, at your request, we observed [James] in class without any of the recommended supports in the last few weeks of school to evaluate his progress, with specific attention to (a) transitions between activities and classes; (b) initiating work on class assignments; and (c) his time on task." D.E. 30, Defs.' Ex. L at 8. The letter also says that "we are extremely concerned about the slow pace of [James's] academic growth this year." *Id.* The letter makes no mention that James had engaged in misbehavior. Indeed, during his deposition, John (James's father) said he understood the need for the aide to be motivated by academic concerns. *See* D.E. 30, Defs.' Ex. K at 96:22-24

7

(Doe Dep.).

Although all of the students may have presented similar behavioral issues, the record indicates that only James also presented significant academic difficulties. No reasonable jury could review this evidence and find that the comparator students are actually similarly situated vis-à-vis James, as none presented the behavior *and* academic issues that he did.

The Does present a second argument that the conditions the school imposed were a pretext for discrimination. Specifically, they contend that Frede himself had discriminatory intent, basing this contention on interactions he had with other employees at Ancona. First, the plaintiffs cite the deposition testimony of Nancy Nassr, another employee at Ancona. The Does state that Nassr "testified that she felt marginalized by Frede because of her status as a Muslim woman." Pls.' Resp. to Defs.' Mot. for Summ. J. at 6. But Nassr testified to almost exactly the opposite: she repeatedly *denied* that Frede treated her differently because she was Muslim. D.E. 51, Pls.' Ex. 1 at 19 (Nassr Dep.) ("he never said anything to me directly that would have indicated that he was biased or, you know—or had some issue with me because of my Muslim faith."). Setting aside whether Nassr's testimony on Frede's intent is even admissible evidence, the Court concludes that the deposition does not support the proposition for which the Does have offered it. Second, the plaintiffs next cite the deposition testimony of Laura Moynihan, the president of the Ancona Board of Trustees. Plaintiffs claim that Moynihan testified that Frede discriminated against Ancona employees by color. In fact, Moynihan stated only that one Ancona employee felt that other employees did not obtain the same benefit of the doubt that she did because she was Yale-educated. D.E.

53, Pl.'s Ex. 1 at 33-34 (Moynihan Dep.). This does not support a finding of anti-Muslim animus on Frede's part. Finally, the Does point to the results of a staff survey, which they contend shows widespread belief that Frede treated staff differently on the basis of their age, race, or gender. But the survey asked respondents to indicate their agreement with the following statement: "At this school, people are supportive of their colleagues regardless of their heritage or background." D.E. 50, Pl.'s Ex. 2 at 0141 (Faculty Survey). The question asks *nothing* about Frede's conduct personally, and thus it is not probative of Frede's purported discriminatory intent. In any event, a study of some employees' views about other employees' attitudes is likely not even admissible and certainly is not probative of any particular employee's or manager's intent. In sum, the Does have not presented evidence of discrimination by Frede against other Ancona employees from which a jury could infer that he discriminated against James.

Lastly, the Does argue that Frede's behavior towards James is indicative of discriminatory intent. First, the plaintiffs claim that Frede once walked away from James when their paths crossed. But no reasonable jury could consider that fact and leap to the inference that the conditions imposed on James's reenrollment were based on religion-based discrimination. Likewise, the plaintiffs claim that Frede treated James unfairly when reviewing an instance in which James was accused of misconduct. Another student accused James of swearing at him and using a racial slur against him. Frede testified that a third student confirmed this accusation. The plaintiffs contend that Frede wrongly treated this conduct as bullying. But no reasonable jury could take the fact that Frede classified the use of swears and racial slurs as bullying and then infer that Frede was biased against James because he was Muslim. Third, the Does

9

contend that Frede permitted other students to bully James—but the only evidence they cite in support is Frede's deposition testimony, in which he denies this allegation. "An argument that is unsupported by definite, competent evidence is insufficient to defeat summary judgment." *Purchase v. Shawnee Community Coll.*, No. 12 C 266, 2014 WL 5317732, at *2 (S.D. Ill. Oct. 17, 2014) (*citing Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001)). Considered separately or together, the evidence cited by plaintiffs would not permit a reasonable jury to infer that Frede was motivated by discrimination in his dealings with James.

In sum, plaintiffs have offered no evidence from which a reasonable jury could find that defendants' proffered reasons for the challenged actions are a pretext for discrimination.

## B. *Ortiz*

Next, the Court applies the *Ortiz* framework, which offers the following standard: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. *See also Oliver v. Joint Logistics Managers, Inc.*, No. 17-1633, 2018 WL 3030076, at *2 (7th Cir. June 19, 2018) (applying *Ortiz* in a section 1981 case); *Martin v. F.E. Moran, Inc.*, No. 13 C 3526, 2018 WL 1565597, at *26 (N.D. Ill. Mar. 30, 2018) (same).

The result is no different. No reasonable jury, assessing the evidence as a whole, could find for the Does on this question. The evidence of claimed similarly-situated students receiving different treatment is not persuasive, because nothing in the record indicates that any of these students had academic issues at all similar to those

James had.  The evidence of Frede's purported bias at Ancona is unpersuasive; as indicated earlier, the plaintiffs have mischaracterized the evidence that they offer on this point.  And finally, the argument that Frede was biased against James personally is unsupported by evidence that would permit such a finding.  Taking all this evidence together, the plaintiffs have failed to present evidence that could convince a reasonable factfinder that James's Muslim religion led the school to impose conditions on his reenrollment.

Finally, the Does concede that none of the Board of Trustees defendants were personally involved in the conduct giving rise to this suit.  An individual defendant may only be liable under section 1981 if the individual participated in the discrimination against the plaintiff.  *Nance v. Rothwell*, No. 09 C 7733, 2011 WL 1770306, at *9 (N.D. Ill. May 9, 2011).  Thus the Board of Trustee defendants would be entitled to summary judgment on the section 1981 claim even if Ancona and Frede were not.

## II.     IIED

Next, the Does contend that the defendants' conduct towards James and John supports a claim for intentional infliction of emotional distress (IIED).  To survive summary judgment on this claim, plaintiffs must offer evidence from which a reasonable jury could find that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant intended that his conduct would cause severe emotional distress, or knew that there was at least a high probability that the conduct would inflict severe emotional distress; and (3) the conduct did in fact cause severe emotional distress."  *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016).  The Does assert IIED claims for both James and John.  Because the father's claim is dependent on the resolution of the

son's claim, the Court considers James's claim first.  Though the Does name all defendants in this count, in their briefs they discuss evidence only against Frede.

The first element is whether the conduct at issue was extreme and outrageous. Although there is no requirement of a contemporaneous physical impact or injury, the conduct must go "beyond all bounds of decency and be considered intolerable in a civilized community."  *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001).  The tort does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (1988) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  Illinois courts generally consider three factors to determine whether conduct is objectively outrageous:  (1) the degree of power the defendant holds over the plaintiff; (2) the defendant's knowledge of the plaintiff's vulnerability to emotional distress, if any; and (3) the defendant's reasonable belief that the conduct was "legitimate."  *Cairel v. Alderden*, 821 F.3d 823, 835-36 (7th Cir. 2016).

The Does contend that Frede acted outrageously though several acts, which the Court considers separately.  The Court begins with the suggestion that Frede acted outrageously by insisting that the Does obtain a one-on-one aide for James and by releasing his spot in the fifth grade class when the Does did not meet this requirement. No reasonable jury could find this to be intolerable or oppressive conduct.  And although Frede, as principal of the school, held power over James, and Frede was obviously vulnerable as a minor, no reasonable jury could conclude that Frede lacked any legitimate reason for imposing conditions on James's reenrollment.  This does not mean that Frede necessarily reached the *right* decision in taking these steps, only that Frede's

12

actions did not "go beyond all bounds of decency."  *Honaker*, 256 F.3d at 490.

Next, the Does contend that Frede acted outrageously by "allowing a history of bullying based on plaintiffs' Muslim status" and by "marginalizing the plaintiffs' complaints about ethnic discrimination."  Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J. at 8.  But these assertions are untethered to any citation to the record, and thus it is not clear what evidence plaintiffs contend shows that Frede routinely permitted students to bully James or that he "marginaliz[ed]" the Does' concerns.  *Id.*  The only concrete assertion the Does make in this vein is that a student told James that "the only reason Donald Trump says that all Muslims should be kicked out of the country is because all Muslims work for ISIS."  D.E. 30, Defs.' Ex. Q at ANCONA0422 (June 3, 2016 Doe e-mail to Frede).[3]  But the Does concede that the classroom teacher subsequently led a discussion about the prejudices that Muslims experience.  Whether or not this response was adequate, this incident cannot legitimately be characterized as outrageous conduct on the part of defendants.  *See Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 626 (7th Cir. 2010) (an administrator's acts, taken in good faith to address misbehavior, are not outrageous, even if the acts are mistaken or erroneous).  The plaintiffs' other assertions—that Frede responded to garden-variety disputes between students with inadequately punitive responses—likewise fall short of the standard for objectively outrageous conduct.[4]

---

[3] The defendants contend that Frede could not have sanctioned the student because his speech was protected under the First Amendment.  The Court does not need to resolve this issue to find that the defendants are entitled to summary judgment.

[4] The plaintiffs specifically focus on an instance in which one sheet of James' academic work was crumpled up—perhaps by another student—and another in which one student kicked James after he pushed her into a wall.

The Does also contend that Frede acted outrageously by "permitting a climate of racial bias in the school." Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J. at 8. The Does support their assertion by citing to the staff survey indicating dissatisfaction with the school climate. As already discussed, the results of the survey addressed the school culture generally; they say nothing about Frede's conduct specifically.

Because James cannot prevail on his IIED claim, John, whose claim is based on watching his son go through the above experiences, likewise could not prevail before any reasonable jury.

Because plaintiffs cannot clear the outrageous conduct hurdle, the Court need not address the remaining elements of their IIED claims.

### Conclusion

For the reasons stated above, the Court grants the defendants' motion for summary judgment [dkt. no. 28] and directs the Clerk to enter judgment in favor of the defendants.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 17, 2018